

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **BEAUMONT LAMAR APARTMENTS, LLC** | § § § | |
| **Plaintiff** | § § | |
| **v.** | § § § | |
| **WALLIS BANK, a Texas banking corporation, MUSA DAKRI, ASIF DAKRI, AYAZ NASSER, ROBERT ADAM, WILLIAM F. BURGE III, NASR KHAN, ROGER SEBESTA, FAIZEL DAKRI, JODIE JILES, JERRY PETERSON, GARY OWENS, FARID VIRANI, MCCUNE CONSTRUCTION SERVICES GROUP, LLC n/k/a MCCUNE CONSTRUCTION FUNDS MANAGEMENT, LLC, AND STEPHEN "STEVE" MCCUNE** | § § § § § § § § § § § § § § | **CIVIL ACTION NO. 4:23-CV-00341-O** **DEMAND FOR TRIAL BY JURY** |
| **Defendants** | § | |

---

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

---

Beaumont Lamar Apartments, LLC ("**BLA**" or "**Plaintiff**") files its *Second Amended Complaint* complaining of WALLIS BANK ("**Bank**"), MUSA DAKRI, ASIF DAKRI, AYAZ NASSER, ROBERT ADAM, WILLIAM F. BURGE III, NASR KHAN, ROGER SEBESTA, FAIZEL DAKRI, JODIE JILES, JERRY PETERSON ("**Peterson**"), GARY OWENS ("**Owens**"), FARID VIRANI,[1] MCCUNE CONSTRUCTION SERVICES GROUP, LLC n/k/a MCCUNE

---

[1] Musa Dakri, Asif Dakri, Ayaz Nasser, Robert Adam, William F. Burge III, Nasr Khan, Roger Sebesta, Faizel Dakri, Jodie Jiles, Peterson, Owens, and Farid Virani shall be collectively referred to herein as the "**Board**."

---

CONSTRUCTION FUNDS MANAGEMENT, LLC ("**McCune Construction**"), and STEPHEN "STEVE" MCCUNE ("**McCune**") (collectively "**Defendants**") and respectfully shows this Honorable Court as follows:

## I.    SUMMARY AND INTRODUCTION

1.    Plaintiff purchased unimproved real property for the purposes of constructing an apartment near the campus of Lamar University.  Bank served as the lender for the project, but truly desired to be the project's developer and general contractor.  Bank made numerous and repeated errors, even admitting that it "screwed up," that it "dropped the ball," and that Plaintiff had a "legitimate grievance."  Time and time again, Bank overstepped its bounds, forcing Plaintiff to follow its every whim and desire.  One such whim was requiring Plaintiff to hire and pay substantial sums to McCune and McCune Construction (collectively "**McCune Defendants**") to serve as a third-party inspector and for a completion guarantee/bond.  McCune Defendants sat on their hands and allowed approximately 98% of the loan funds to be distributed to the general contractor despite the general contractor completing only 58.7% of the first phase of the construction project and completing only approximately 8% of the second phase of the construction project.  When the general contractor ultimately "walked the job" and was terminated, Plaintiff, at the request and demand of Bank, triggered a completion guarantee/bond requiring McCune Construction Defendants to serve as the general contractor and complete the construction.  Shockingly, again, McCune Defendants sat on their hands and did nothing.  Seizing this opportunity, Bank attempted to pounce on Plaintiff and sought to foreclose, "whipsawing" Plaintiff.  Bank refused to fund construction of the construction project, but sought to foreclose because the construction was not complete despite Plaintiff continually making payments.  Defendants' actions and inactions have cost Plaintiff millions of dollars.  All Plaintiff ever wanted

was complete the construction of the apartment complex.  Defendants' actions and inactions constitute breach of contract; fraud; conspiracy; lender liability – breach of good faith and fair dealing, lender liability – negligence, lender liability – breach of fiduciary duty, gross negligence; money had and received; wrongful foreclosure; violations of the Texas Insurance Code; violations of the Texas Deceptive Trade Practices Act ("**DTPA**") and violations of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**") (18 U.S.C. § 1962(c), (d)).  Plaintiff seeks all recoverable damages, including treble damages and threefold damages, for the millions of dollars of damages caused by Defendants' fraudulent, deceptive, and nefarious acts and omissions.

## II.    **PARTIES**

2.    Plaintiff is a Texas limited liability company with a principal place of business at 1251 William D. Tate Ave., Unit 5, Grapevine, Tarrant County, Texas 76099.

3.    Bank is a Texas banking corporation operating multiple locations throughout Texas with a principal place of business at 6510 Railroad Street, P.O. Box 339, Wallis, Texas 77485. Bank also has branches in California and Georgia.

4.    Musa Dakri is an individual residing in the State of Texas.  Musa Dakri is the Chairman and Director of Bank.

5.    Asif Dakri is an individual residing in the State of Texas.  Asif Dakri is the Vice Chairman, Chief Executive Officer, and Director of Bank.

6.    Ayaz Nasser is an individual residing in the State of Texas.  Ayaz Nasser is a Director of Bank.

7.    Robert Adam is an individual residing in the State of Texas.  Robert Adam is a Director of Bank.

8.      William F. Burge III is an individual residing in the State of Texas.  William F. Burge III is a Director of Bank.

9.      Nasr Khan is an individual residing in the State of Texas.  Nasr Khan is the Executive Vice President, Chief Legal Officer, and Director of Bank.

10.     Roger Sebesta is an individual residing in the State of Texas.  Roger Sebesta is the Chief Financial Officer, Chief Information Officer, and Director of Bank.

11.     Faizel Dakri is an individual residing in the State of Texas.  Faizel Dakri is the Chief Information Officer and Director of Bank.

12.     Jodie Jiles is an individual residing in the State of Texas.  Jodie Jiles is a Director of Bank.

13.     Jerry Peterson is an individual residing in the State of Texas.  Jerry Peterson is the Executive Vice President, Chief Credit Officer, and Director of Bank.

14.     Gary Owens is an individual residing in the State of Texas.  Gary Owens is the President and Director of Bank.

15.     Farid Virani is an individual residing in the State of Texas.  Farid Virani is a Director of Bank.

16.     This complaint will refer to Bank, Musa Dakri, Asif Dakri, Ayaz Nasser, Robert Adam, William F. Burge III, Nasr Khan, Roger Sebesta, Faizel Dakri, Jodie Jiles, Jerry Peterson, Gary Owen, and Farid Virani collectively as the "**Bank Defendants**."

17.     McCune Construction is a Texas limited liability company with a principal place of business at 5316 Woodway Dr., Fort Worth, Texas 76133.

18.     Stephen "Steve" McCune is an individual believed to reside in Tarrant County, Texas.  Stephen "Steve" McCune is the President of McCune Construction.

### III.    JURISDICTION AND VENUE

19.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a), in that this matter concerns a civil action arising under the laws of the United States, namely, the Racketeer Influenced and Corrupt Organizations ("**RICO**") Act, 18 U.S.C. § 1961, *et seq*.  This Court has supplemental jurisdiction to hear and decide the pendent state law claims under 28 U.S.C. § 1367(a).

20.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1441(a); 18 U.S.C. § 1965(a).

### IV.    FACTUAL ALLEGATIONS

21.    On or about July 24, 2019, Plaintiff acquired unimproved real property consisting of approximately three (3) acres located at 1030 Cardinal W. Drive, Beaumont, Texas 77705 ("**Property**").  Plaintiff purchased the Property with the intent of using the equity in the Property to serve as collateral for a construction loan to fund Plaintiff's construction of an apartment complex near the campus of Lamar University.  Plaintiff hired an architect to design and render plans for an apartment complex.  The architectural plans consisted of one hundred twenty (120) units to be completed in one single phase.

22.    Plaintiff searched for and located a financial institution, Bank, to provide financing for the construction project.  Bank Defendants demanded that construction occur in two (2) phases (*i.e.,* Phase I and Phase II) despite the architectural drawings requiring construction in one phase being that there was overlapping construction.  Ultimately, Plaintiff had no choice but to submit to Bank Defendants' demands.  Plaintiff was induced into accepting loans based on Bank's false

promises. The plans for Phase I consist of fifty-four (54) units, and Phase II consists of sixty-six (66) units. The project is known as The Palms at Cardinal ("**Apartment Complex**").

23.     Because Bank Defendants required construction to be split into phases, Plaintiff was required to obtain two (2) loans for the construction of the Apartment Complex, which necessitated finding a general contractor that would construct the Apartment Complex in an unorthodox fashion in two (2) phases, under the terms of two (2) contracts, and under two (2) loans. Bank Defendants required that Plaintiff and any general contractor enter into two (2) separate contracts delineated as Phase I and Phase II. This was wildly unorthodox and scared off seasoned and quality general contractors. Plaintiff reached out to approximately fifteen (15) different general contractors, but only three (3) general contractors submitted bids due to the two (2) phase approach required by Bank Defendants.

24.     In or about late November 2019 and early December 2019, Plaintiff received bids to construct the Apartment Complex. OneForce Construction, LLC ("**OneForce**") is one of the construction companies that bid to perform work to construct the Apartment Complex at the Property. After reviewing bids, Plaintiff accepted the bid provided by OneForce subject to the Bank Defendants' review and agreement. Bank Defendants informed Plaintiff's representatives that it conducted due diligence on OneForce and, ultimately, agreed that Plaintiff could hire OneForce to serve as the general contractor for the construction of the Apartment Complex.

25.     On or about December 30, 2019, Plaintiff and OneForce entered into the *AIA Standard Form of Agreement between Owner and Contractor* pertaining to Phase I of the Apartment Complex ("**Phase I Agreement**"). Due to OneForce's failure to timely complete Phase I, the Phase I Agreement was amended to give OneForce additional time to complete Phase I of the Apartment Complex (collectively "**Phase I Agreement**"). On or about August 10, 2020,

Plaintiff and OneForce entered into the *AIA Standard Form of Agreement between Owner and Contractor* pertaining to Phase II of the Apartment Complex ("**Phase II Agreement**"). Additionally, Bank Defendants required Plaintiff and OneForce to enter into written agreements with Bank Defendants pertaining to the distribution of funds, construction of the Apartment Complex, and other terms.

26.    When Plaintiff's representative was reviewing the loan commitment, he noticed a reference to a completion guarantee/bond and requested information on the same. Bank Defendants informed Plaintiff that a completion guarantee is a bond, and he was required to use only one provider, McCune Construction. Much to the chagrin of Plaintiff, Bank Defendants informed Plaintiff that it was required to hire McCune Construction to serve as a third-party inspector and to provide a completion guarantee/bond. Bank Defendants represented to Plaintiff that McCune Defendants were long-time business associates of Bank Defendants and provided the bond that could be triggered in the event the general contractor failed to complete construction. The bond, as represented by Bank Defendants, would be paid by Plaintiff to McCune Defendants at closing for both the Phase I and Phase II loans. Bank Defendants' representatives represented and stated that McCune Defendants had been hired by Bank hundreds of times to perform services and required developers, like Plaintiff, to hire McCune Defendants.

27.    After demanding that Plaintiff hire McCune Defendants, Bank Defendants moved forward and brokered an agreement requiring Plaintiff to use McCune Defendants as a third-party inspector to oversee and distribute funds to OneForce as warranted. Plaintiff, as well as OneForce and Bank, entered into written agreements with McCune Defendants to perform such services for Phase I on or about December 30, 2019, and for Phase II on or about November 1, 2021. McCune Defendants' written agreements state that "[Bank] appoints McCune [Defendants] as its agent for

the sole purpose of providing Progress Reviews and Funds Disbursement services on the [Apartment Complex], including but not limited to periodic Progress Reviews and Reports." As a part of the function of McCune Defendants' role, McCune Defendants were required to follow the construction project to determine whether work was performed and whether the general contractor was entitled to a distribution of funds. It was represented by Bank Defendants and McCune Defendants that McCune Defendants closely followed the construction schedule to make sure the general contractor completed all necessary tasks before being paid and, further, would make sure that the construction project stayed on course in terms of construction and distribution of funds based on work actually completed. Plaintiff paid McCune Defendants to conduct site inspections and distribute funds for work performed. Ultimately, Plaintiff paid McCune Defendants for review of twenty-two (22) draw requests on Phase I alone despite McCune Defendants' written agreement calling for only eight (8) reviews and eight (8) draw requests. Bank Defendants and McCune Defendants required and demanded Plaintiff pay for fourteen (14) additional inspections.

28.    As noted above, in addition to McCune Defendants' role as the third-party inspector and overseeing and causing the distribution of funds, Bank Defendants demanded and, ultimately, brokered an agreement requiring Plaintiff to purchase what was represented as a bond and labeled as "The Completion Guarantee." Such completion obligation and bond would only be triggered if the general contractor failed to perform. Specifically, McCune Construction indicated it *"is so confident in its ability to manage the construction loan funds of your project that it guarantees its performance to the extent that should Contractor fail to perform the Work it will assume complete responsibility for the management of all construction activities on the Project needed*

***to complete the project….."*** Bank Defendants required Plaintiff to pay for the bond for both Phase I and Phase II.

29.    Bank Defendants effectively acted as a captive insurance broker requiring Plaintiff to work exclusively with McCune Defendants' insurance products.  With Bank Defendants leaving Plaintiff no reasonable alternative, Plaintiff did as it was demanded and told.  Plaintiff purchased performance bonds from Bank Defendants' long-time associates, McCune Defendants.  Plaintiff met its obligations, as required by Bank Defendants, to pay for the bond.  Interestingly, and without explanation, the Settlement Statement for the Phase I loan shows that Plaintiff paid $50,000.00 for the "Completion Guaranty Fee to Wallis Bank" despite McCune Defendants' agreement requiring payment of only $24,450.00.  Without disclosure to Plaintiff, the insurance broker, Bank Defendants took the difference as a fraudulent insurance commission.

30.    Likewise, the Settlement Statement for the Phase II loan shows that Plaintiff paid $20,640.00 for the "Guarantee fee fbo McCune Construction Services Group, LLC to Wallis Bank," but Bank Defendants apparently never transferred such fee to McCune Defendants. Despite a written agreement with McCune Defendants, McCune Defendants refused to accept their duties and obligations for the guarantee/bond fee and demanded additional funds from Plaintiff. Bank Defendants, the insurance broker, remains in possession of these funds to this day and, apparently, is treating such funds as another fraudulent insurance commission.  Bank has now admitted to retaining these funds, but refused to return these funds.

31.    Due to Bank Defendants' misrepresentations, interference, meddling in the construction, and selection of vendors, the construction of the Apartment Complex was doomed to fail.  Bank Defendants "screwed up", "dropped the ball", and confirmed Plaintiff had a "legitimate grievance" due to Bank Defendants' numerous and repeated errors.  Intending to take

over the property for themselves, Bank Defendants have made the construction project on the Property unnecessarily difficult and have caused and been a part of numerous errors. Bank Defendants admitted they "screwed up":



Similarly, Bank Defendants confirmed that Plaintiff had a "legitimate grievance" related to Bank Defendants' errors:



Bank Defendants also admitted that they "dropped the ball," causing harm and damage to Plaintiff:



Bank Defendants failed to timely fund construction on multiple occasions, which was a cause of the deterioration of the relationship between Plaintiff and OneForce. Bank Defendants even lost draw requests. Bank Defendants, with an assist from McCune Defendants, intentionally delayed and held the disbursement of funds for draws to stretch the project, so Plaintiff would be required to pay more and more fees and interest. McCune Defendants worked hand-in-hand with Bank to slowly conduct inspections and slowly disburse funds. Due to these intentional delays, Plaintiff even had to pay contractors out-of-pocket to keep the construction project moving forward. Defendants have replicated this scheme and used similar approaches with other unsuspecting customers.

32.     Bank Defendants wanted to be the general contractor of the construction project on the Property and interjected itself time and time again. For example, on January 26, 2021, the City of Beaumont Fire Prevention Division issued a "Stop Work Order" as follows:



The basis for the "Stop Work Order" was a result of construction that had to be performed to allow the fire department access to the Property. Because Bank Defendants required that construction be split into phases, Phase I and Phase II, Plaintiff was placed in an unwinnable predicament. The fire department must have a drive that allows for fire vehicles to enter and exit in a loop and must also have access to water. The installation of the water lines and the remainder of the concrete was ridiculously put into the Phase II loan over the objection of Plaintiff. Under Bank Defendants' requirements, some of the funds to complete these obligations were in the Phase I loan, and some were in the Phase II loan. Bank Defendants demanded that construction of Phase I must be completed before any construction in Phase II would occur. This approach placed Plaintiff in a quagmire forcing Plaintiff to submit to Bank Defendants every' whim and demand, or the construction project would not move forward and would not be completed.

33. In response to this predicament, Plaintiff's representative asked for funds necessary to complete construction requirements mandated by the fire code and to continue construction. To accomplish this simple and obvious request, funds needed to merely be transferred from the Phase II loan to the Phase I loan. Bank Defendants were receptive and agreed to do so. However, when

Plaintiff's representative arrived to close what was represented as a loan modification, he learned that Bank Defendants misrepresented the terms to him.  In fact, Bank Defendants prepared a ***third loan, not a modification***.  When Plaintiff's representative learned of the misrepresentation, he immediately called Peterson and demanded to know why Bank Defendants made such material misrepresentations.  In the "gotcha" moment, Peterson said the Board was well aware of the circumstances and required a third loan for even more money, causing further indebtedness, and more loan and interest payments.  Plaintiff was livid, but was told that if he refused to execute the third loan, construction would cease, there would be no additional funding, and Bank Defendants would foreclose on the property.  This was a shocking approach designed to force Plaintiff to agree to the third loan, even though the exact funds needed were already budgeted as a part of the Phase II loan.  Rather than simply move funds from the Phase II loan to the Phase I loan to continue with construction, Bank Defendants deceptively required Plaintiff to take out the third loan requiring more fees, costs, and expenses that detrimentally affected Plaintiff and the project as a whole.  The third loan was a trap used by Bank Defendants to force Plaintiff to allow Bank Defendants to further control the construction project.

34.    The third loan contained a provision purporting to release ] the Bank Defendants liability.  That provision is unenforceable.

A.    The provision is unenforceable because it was produced under economic duress.  Bank Defendants threatened to foreclose on the property under the first loan agreement if Plaintiff did not agree to the third loan agreement.  But the first loan agreement was obtained fraudulently, meaning Bank Defendants threatened to take an action they had no legal right to do.  Further, Bank Defendants had tortiously interfered with Plaintiff's Contracts with the McCune Defendants by

convincing the McCune Defendants to not inspect and oversee the project, not issue reports to Plaintiff concerning the incompletion of the project, issue funds to the general contractor for work that was not completed, and to refuse to complete the project itself, so that the construction project was already in a state where it critically needed more funds. This too was an act the Bank Defendants had no legal right to do. Because of Bank Defendants' actions that they had no legal right to do, Plaintiff had no option but to agree to the third loan. Plaintiff was on the hook for millions of dollars in debt to Bank, and Plaintiff's only equity was in the property. But until the project was completed, its value would not surpass the debt Plaintiff owed. By threatening to foreclose on the property, Bank Defendants forced Plaintiff to agree to the third loan, destroying Plaintiff's free agency. Faced with the threat foreclosure, Plaintiff's free will was overcome and he accepted the third loan, which he would not have done but for the threat. Bank Defendants would have foreclosed on the property in the next few days if Plaintiff had not agreed to the third loan, making the restraint on Plaintiff imminent. Due to the state of construction and numerous errors and failures of Defendants, Plaintiff was unable to get a loan from any other lender. Given that Plaintiff's equity was tied up in the property and the prior loans, and that because of McCune Defendants' failings the project was behind scheduled and needed substantially more money in order to get back on track, Plaintiff had no other means of protection but to agree to the third loan. These facts show that the third loan was produced under economic duress, and therefore the liability release provision is unenforceable.

B.    The provision is also unenforceable because it was unconscionable.  Bank Defendants had orchestrated the foreclosure through a malicious plan to take Plaintiff's property from him; had not acted in good faith; and had conspired with others to obtain the property for much lower than it was worth, run the construction itself, and then profit from the property as fully developed, while leaving Plaintiff with nothing but a gigantic debt.  Bank Defendants, through their bad actions, placed themselves at an inequitable bargaining advantage over Plaintiff such that Plaintiff had to accept the terms of the third loan and lacked any meaningful choice otherwise.  Bank Defendants only got Plaintiff to the bargaining table in the first place by claiming they would modify the First Loan to allow Plaintiff to use funds from the Second Loan.  Only once Plaintiff arrived did Bank Defendants inform Plaintiff that they had lied and would actually only sign a third loan.  Bank Defendants then included in that third loan a release liability to ensure that it could not be held responsible for its prior bad, malicious, and conspiratorial acts.  Yet, under the circumstances, Plaintiff had no option but to agree to the third loan.  This was unconscionable.  The release provision is unenforceable.

35.    As time progressed and the construction of the Apartment Complex lingered, Plaintiff learned that OneForce fell behind in paying subcontractors and was requesting payment for work that was not performed.  Plaintiff complained to Bank Defendants that McCune Defendants were not performing its duties and was not monitoring the distribution of funds as required, but Bank Defendants refused to remove McCune Defendants and refused to allow Plaintiff to hire an inspector who would actually perform the duties and functions of its role.

McCune Defendants and Bank Defendants recklessly released funds to OneForce without confirming that the construction project was progressing as intended.

36.    On or about May 12, 2022, OneForce submitted a draw request for $234,900.00, indicating that the construction was 97.28% complete. Quite to the contrary, McCune Defendants reviewed the Property and determined OneForce had completed only "approximately 88%" of the construction project and was not entitled to an additional payment. McCune Defendants recklessly failed at every level to perform their duties and distributed approximately 98% of the funds for Phase I of the construction project. Ultimately, a OneForce representative confirmed he was "in over his head" and "walked the job." Plaintiff was forced to terminate OneForce.

37.    A third-party inspector hired by Bank Defendants confirmed in October 2022 that Phase I of the construction project was only "about 60% complete." After Plaintiff's expert's review, it was confirmed that Phase I is only approximately 58.7% complete and Phase II is only approximately 8% complete. Despite the construction project being woefully behind and the loan funds being recklessly distributed over the objection of Plaintiff, Defendants failed to take any accountability for their failed oversight and the unbelievable failures in distributing funds to a contractor who did not complete the work as required. Rather than look internally, Defendants pointed the finger at Plaintiff.

38.    Instead of walking away silently, OneForce doubled down and filed two (2) liens in the real property records of Jefferson County, Texas. On or about September 13, 2022, and September 14, 2022, respectively, OneForce caused to be filed in the real property records of Jefferson County, Texas, the *Affidavit Claiming Mechanic's and Materialman's Lien* (Instrument No. 2022031533) signed by Tibebe Alamrew of OneForce and the *Affidavit Claiming*

*Constitutional Mechanic's and Materialman's Lien* (Instrument No. 2022031697)[2] signed by Tibebe Alamrew of OneForce (collectively "**Lien Filings**").

39.    After OneForce "walked the job" and was terminated, McCune Defendants candidly acknowledged that they had allowed this construction project to spiral out of control.  In a declaration executed under oath, after OneForce "walked the job" and was terminated, McCune testified, in pertinent part, as follows:

> "Frankly, I am baffled by the filing of the [Lien Filings].  Based on my review of the [Lien Filings], they appear to be fraudulent and nothing short of fiction."

> \*\*\*

> "[OneForce] abused this project.  [OneForce] failed to have adequate trades perform the required work.  Many times, the project was empty and not being worked despite contractual deadlines.  The filing of the [Lien Filings] is nothing short of absurd.  McCune [Construction] was tasked with determining whether [OneForce] was entitled to payments.  [OneForce] was not entitled to any other payments.  [OneForce] has been paid for all work performed."

> \*\*\*

> "In McCune [Construction]'s reviews, it has uncovered numerous construction errors and defects."

> \*\*\*

> "Due to the state disarray of the project caused by [OneForce], there remains a significant amount of work that must be performed.  The project is not complete."

---

[2] The *Affidavit Claimant Constitutional Mechanic's and Materialman's Lien* (Instrument No. 2022031697) was filed with six (6) total pages.  Such instrument references Exhibits A-J, but no such exhibits were attached.  Accordingly, it is unclear of specifically what is being referenced.

40.    Admittedly, McCune Defendants were aware or became aware that OneForce was not completing the construction project as required and was making "numerous construction errors and defects." Yet, McCune Defendants and Bank Defendants opened the checkbook and issued payment after payment for unperformed and faulty work. These reckless errors caused the costs and the project in total to spin out of control. To date, Plaintiff is left with a partially built Apartment Complex with a substantial amount of work yet to perform, errors to remedy, increased costs of construction, and depleted loan funds.

41.    Throughout the construction project and after the Lien Filings, Plaintiff remained in constant communication with Bank Defendants and, specifically, with Peterson, Bank's Executive Vice President and Chief Credit Officer, and Owens, Bank's President. Bank Defendants initially seemed to be sympathetic to Plaintiff's plight and the failures of OneForce and McCune Defendants. Bank Defendants, through Peterson and Owens, acknowledged they knew that construction was performed improperly and loan funds were distributed for work not performed. Peterson even confirmed that Bank and its Board agreed that the Lien Filings were fraudulent.

42.    The sympathy and reasonableness of the Bank Defendants, however, were short-lived. If Bank Defendants' conduct could not get any more bizarre, Plaintiff's relationship with Bank Defendants began to deteriorate when Plaintiff's representative refused to provide Peterson with a personal loan or find someone else willing to make a private loan. Apparently, Peterson spends substantial sums of money at adult entertainment establishments and was personally running out of money despite having a large salary and bonuses from Bank Defendants. The following confirms the same:











43.    After initially refusing to make a private loan to Peterson or find someone who would make a private loan, Bank Defendants orchestrated an old fashion Texas "whipsaw."  As a result of the filing of the Lien Filings, Bank Defendants refused to fund the construction project, but informed Plaintiff that it would accelerate the loans and foreclose on the Property if construction ceased for more than fifteen (15) days.  Bank Defendants instructed Plaintiff to communicate exclusively with Peterson.  Peterson was the very person who was seeking a private loan from Plaintiff's representative and flipping the switch on Plaintiff because Plaintiff's representative refused to fund a private loan.

44.    Plaintiff continued to communicate and meet with Bank Defendants' representatives about completing construction and funding the construction project.  Plaintiff also vowed to take all steps necessary to remove the Lien Filings.

45.    Plaintiff diligently searched for and interviewed construction professionals to complete the construction project.  Yet, Bank Defendants preferred using McCune Defendants to complete the construction project.  Plaintiff reiterated that McCune Defendants were at fault for allowing the construction project to spiral out of control.  Nonetheless, Bank Defendants pushed for McCune Construction to serve as the general contractor.  Bank Defendants informed Plaintiff

that they had done hundreds of completion guarantees/bonds with developers and McCune Defendants. According to Peterson, the Bank and its Board said McCune Defendants were the right contractor to complete the job and pushed for Plaintiff to utilize McCune Defendants to complete the project. At the request and mandate of Bank Defendants, on November 2, 2022, Plaintiff triggered the completion guarantee/bond that was described to Plaintiff by Bank Defendants as a bond of completion.

46.    After communicating with OneForce in an attempt to allow OneForce to voluntarily remove and release the Lien Filings to no avail, on or about October 18, 2022, Plaintiff filed a petition to remove the Lien Filings. After multiple re-settings, on February 2, 2023, Plaintiff and OneForce presented for a hearing before an arbitrator for the removal of the Lien Filings. On the same day, the arbitrator issued an order finding and ordering as follows:

1.    [T]he *Request for R-39 Emergency Measures* and the emergency relief sought in the *Petition* is GRANTED; and

2.    [T]he Lien Filings are fraudulent, invalid, and/or unenforceable under Texas law; and

3.    [T]he *Affidavit Claiming Mechanic's and Materialman's Lien* (Instrument No. 2022031533) filed on September 13, 2022 and associated lien shall be summarily and immediately removed from the Property; and

4.    [T]he *Affidavit Claim[ing] Constitutional Mechanic's and Materialman's Lien* (Instrument No. 2022031697) filed on September 14, 2022 and associated lien shall be summarily and immediately removed from the Property.

The following day, on February 3, 2023, a trial judge in Jefferson County, Texas, entered the *Order Removing Fraudulent, Invalid, and Unenforceable Liens* and confirmed "the Lien Filings are fraudulent, invalid, and unenforceable under Texas," thereby removing the Lien Filings. Subsequently, the Jefferson County, Texas trial court's order was filed in the real property records of Jefferson County, Texas.

47.    After meeting with McCune Defendants and attempting to communicate with them about the construction project, Plaintiff expected and understood that McCune Defendants would step in, roll up their sleeves, and get to work.  Nothing could be farther from the truth.  Since triggering the completion guarantee/bond, McCune Defendants have done virtually nothing.  McCune Defendants even attempted to shake Plaintiff down for more money.

48.    McCune Defendants have not presented a construction plan and have not performed a single act of construction.  Every time Plaintiff has communicated with McCune Defendants, McCune has stated that he is searching for a new general contractor and/or project manager to complete the construction project.  Such an assertion is odd being that Plaintiff paid McCune Defendants handsomely to step into the role of the general contractor.  Why was Plaintiff required to pay Bank Defendants' buddy and associate, McCune, so that McCune could attempt to find someone else to complete the project?  Bank Defendants and McCune Defendants conspired to line their pockets to the detriment of Plaintiff.

49.    To make matters worse, Plaintiff learned from McCune that McCune Defendants are wholly unequipped to serve as the general contractor and complete the construction.  McCune informed Plaintiff that McCune Defendants have entered into hundreds of agreements requiring a completion guarantee/bond that were brokered by Bank Defendants, but have not had to actually perform on any one of these hundreds of bonds.  Instead, pursuant to Bank Defendants' interference and plan, McCune confirmed he "d[id] not know where to start" and "does not have crews to complete this job."  Plaintiff was shocked.  McCune Defendants developed a "brother-in-law agreement" with Bank Defendants where Bank Defendants forced unsuspecting developers, including Plaintiff, to pay sizeable sums of money to McCune Defendants while ensuring McCune Defendants' inability to actually perform.

50.     Plaintiff moved diligently to proceed with construction.  After removing the Lien Filings and paying property taxes, Plaintiff and Bank Defendants agreed to meet to get construction back on track in mid-February 2023.  After Plaintiff took all steps demanded by Bank Defendants, Bank Defendants cancelled all scheduled meetings with Plaintiff and refused to meet or communicate with Plaintiff.  On March 7, 2023, Plaintiff's loan officer at Bank informed Plaintiff that he was no longer able to communicate with Plaintiff.  All the while, Plaintiff dutifully made loan payments to Bank in hopes that the construction project would again be funded and completed.  Bank Defendants sat on their hands in hopes that they could accelerate Plaintiff's loan and foreclose on the Property.  Bank Defendants have asserted it would and did take action against Plaintiff for failure to timely complete construction despite its numerous errors and refusal to fund the construction project.  Plaintiff presented a "gameplan" to complete construction, but Bank Defendants have refused to meet, discuss, or consider Plaintiff's plan.  Bank Defendants was lurking in the weeds to attack Plaintiff and steal Plaintiff's sizeable equity in the Property.  Plaintiff has been informed that this is a common practice for Bank and its Board to aggressively create and concoct schemes to defraud and take property from unsuspecting property owners.  Such a scheme cannot and will not be tolerated.

## V.     CAUSES OF ACTION

51.     All conditions precedent for recovery have been met.

## COUNT I: BREACH OF CONTRACT

52.     Plaintiff incorporates paragraphs 21-51 herein by reference as if such paragraphs were reproduced verbatim.

53.     Plaintiff entered into the completion guarantee/bond with McCune Defendants and Bank Defendants.  The completion guarantee/bond is a written agreement requiring McCune

Construction to become the general contractor for the construction project if the original contractor fails to complete the construction project. At the request and mandate of Bank Defendants, on November 2, 2022, Plaintiff triggered the terms of the completion guarantee requiring McCune Construction to step into the role of the general contractor.

54.     After meeting with McCune Defendants and attempting to communicate with them about the construction project, Plaintiff expected and understood that McCune Defendants would step in, roll up their sleeves, and get to work. Nothing could be farther from the truth. Since triggering the completion guarantee/bond, McCune Defendants have done virtually nothing. They have not presented a construction plan and have not performed a single act of construction. Every time Plaintiff has communicated with McCune Defendants, McCune has stated that he is searching for a new general contractor and/or project manager to complete the construction project. Such an assertion is odd being that Plaintiff paid McCune Defendants handsomely to step into the role of the general contractor.

55.     McCune Defendants have utterly failed and refused to honor the terms of the completion guarantee/bond, which was described to Plaintiff as a completion bond. Plaintiff purchased completion guarantees/bonds for both Phase I and Phase II as mandated by Bank Defendants. Bank Defendants have continued to refuse to communicate with Plaintiff and have refused to fund construction despite contractual obligations to do so. Such refusals to fund construction constitute a breach, and material breach, of the loan documents for which Plaintiff and Bank are parties. Accordingly, McCune Defendants and Bank Defendants are in breach. Plaintiff has suffered and continues to suffer damages as a result of McCune Defendants and Bank Defendants' conduct.

## COUNT II: FRAUD

56.     Plaintiff incorporates paragraphs 21-54 herein by reference as if such paragraphs were reproduced verbatim.

57.     Bank Defendants made representations to Plaintiffs that were material and false. When Bank Defendants made the representations to Plaintiff, Bank Defendants knew or should have known that such representations were false or made recklessly without knowledge of the truth. Bank Defendants made representations to Plaintiff with the intent that Plaintiff acts on such representations. Plaintiff relied on such representations causing Plaintiff injury and damage.

58.     Bank Defendants told Plaintiff that they needed to split the construction loan into two parts, because the board would not otherwise approve the loan. This was false. In reality, Bank Defendants wanted to split the loan into two parts so that the construction project would experience difficulties and Bank Defendants could step in and take over or acquire the property, stealing Plaintiff's valuable equity in it. Bank Defendants omitted to inform Plaintiff of their true intentions to take over the project and steal the property from him. Bank Defendants have now indicated that they split the project into two phases and two loans, because they believed Plaintiff would default on the first loan and Phase I. Bank Defendants' omission was material, as Plaintiff would not have entered into the project if he had known what Bank Defendants were planning to do.

59.     Bank Defendants also told Plaintiff that McCune Defendants would serve as a third-party inspector and, pursuant to a completion guarantee/bond, would inspect and oversee the general contractor completing project as it was occurring, issue funds appropriately for work properly completed, and complete the project should anything go wrong with the original general contractor. Bank Defendants told Plaintiff that McCune Defendants would prepare and provide

progress reviews, and inspect the construction progress to determine whether work was performed and whether the general contractor was entitled to a distribution of funds and only approve fund distributions to the general contractor that were warranted.  Defendants specifically represented that McCune Defendants would closely follow the construction schedule to make sure that the general contractor completed all necessary tasks before being paid, and that the construction project would stay on course.  Bank Defendants represented that they had worked with McCune Defendants many times before.

60.    Bank Defendants knew that their representations were false.  Bank Defendants knew that the construction loan did not actually need to be split in two parts for the board to approve and that their asserted reason was baseless.  Bank Defendants also knew of their plan to take the project over and steal the property from Plaintiff and thus knowingly omitted to tell Plaintiff that information.  Bank Defendants knew that McCune Defendants would not perform under the terms of the completion guarantee/bond; namely, that McCune Defendants would not inspect and oversee the construction at the project to ensure it was done correctly and stayed on track, that McCune Defendants would issue the funds to the general contractor despite the general contract nor completing the work it was supposed to, and that McCune Defendants would not complete the project should the original general contractor not be able to.  Bank Defendants also apparently now claim that they have never worked with McCune Defendants before.

61.    Bank Defendants intended that Plaintiff would act on its false representations. Bank Defendants recognized that Plaintiff was surprised that the loan would be split into two parts and so falsely assured Plaintiff that the Board would only approve the loan if it was split into two parts.  Bank Defendants also recognized that Plaintiff would not be expecting Bank Defendants to use the loans to try and take the project for themselves.  Bank Defendants further assuaged any

skepticism on Plaintiff's part by ensuring Plaintiff that McCune Defendants would inspect and oversee the project as it was completed to alert Plaintiff to any problems. Bank Defendants further assuaged Plaintiff of any concerns by stating that McCune Defendants would complete the project should anything happen with the original general contractor. Bank Defendant further assuaged Plaintiff of any concerns by telling Plaintiff that they had worked with the McCune Defendants on many projects before. Yet Bank Defendants knew that if Plaintiff was aware of the falsity of these statements and the material omissions, Plaintiff would not enter into the loan agreement with Bank Defendants. Thus, Bank Defendants deliberately provided Plaintiff a false explanation for breaking the loan into two parts, deliberately omitted to tell Plaintiff of their true intent, and deliberately misrepresented what McCune Defendants would do so that Plaintiff would enter the contract.

62.    It was reasonable for Plaintiff to rely on Bank Defendants' misrepresentations. Plaintiff had no reason to suspect that Bank Defendants were not operating in good faith and would try to steal the project away from him and cause him to fail. Bank Defendants' assurances that it had used McCune Defendants many times before made it all the more reasonable for Plaintiff to believe that McCune Defendants would perform as promised.

63.    Bank Defendants scheme played out exactly as they anticipated. Bank Defendants concocted and executed a scheme where they interfered with and interjected themselves into the construction project beyond merely funding the loans. The scheme had a common purpose and goal to be accomplished – to take over the construction project and, ultimately, seek to steal valuable real property and improvements from Plaintiff, specifically, the Property. Plaintiff worked diligently to develop and construct an Apartment Complex on the Property. But Bank Defendants had other plans. Pursuant to their misrepresentations, Bank Defendants required

Plaintiff to split the construction of the Apartment Complex into two phases, Phase I and Phase II. The only reason Plaintiff agreed was because of Bank Defendants misrepresentations. As Bank Defendants anticipated, this construction plan that they mandated violated local code and resulted in a "Stop Work Order" issued by the City of Beaumont. When Plaintiff asked that funds from the Phase II loan be moved to the Phase I loan to allow for the installation and construction of certain water pipes and a circle drive as required by the City of Beaumont, Bank Defendants sprung their trap. Rather than acknowledge their ill desires and ineptitude, Bank Defendants doubled down. After initially agreeing to a loan modification to move the funds as needed, Bank Defendants tricked Plaintiff and forced him to enter a third loan for funds that were already earmarked under the Phase II loan. This further indebted Plaintiff.

64.    When Plaintiff objected to a third loan, Peterson told Plaintiff that it would have to enter into a third loan, or Bank Defendants would take action against Plaintiff to strip Plaintiff of the Property. A third loan was never mentioned to Plaintiff and was only discovered when Plaintiff traveled to the title company to execute what was understood to be a simple loan modification to move certain necessary funds from the Phase II loan to the Phase I loan. Peterson further informed Plaintiff that the Board mandated this course of action and would be aggressive in seeking to foreclose on the Property if Plaintiff did not do exactly as mandated by the Board. Plaintiff was left with no choice but to execute documents for a third loan under economic duress. The only term in the third loan that was negotiated was the amount of the loan (Plaintiff was told it was a modification) whereas the other terms were merely boilerplate. Plaintiff was not represented by counsel during the transaction.

65.    To make matters worse, Bank Defendants used McCune Defendants to further defraud Plaintiff. Bank Defendants again overstepped their bounds and mandated that Plaintiff

hire McCune Defendants to serve as the third-party inspector for the construction project and to issue a completion guarantee/bond. As Bank Defendants anticipated, McCune Defendants appeared to fell asleep at the wheel and allowed OneForce to trample all over the construction project and receive payment for work not performed. Ultimately, McCune Defendants and Bank Defendants distributed approximately 98% of the loan funds from the Phase I loan despite Phase I of the construction project being only 58.7%% complete and Phase II is only approximately 8% complete. When Plaintiff complained that McCune Defendants were not performing and were acting recklessly with construction funds, Bank Defendants shooed Plaintiff away and refused to remove McCune Defendants.

66.    As Bank Defendants have apparently done hundreds of times to unsuspecting developers and property owners, Bank Defendants conspired with McCune Defendants to require Plaintiff to enter into a completion guarantee/bond. Plaintiff was told by Peterson that the completion guarantee is a completion bond that required substantial payment and a commitment of Plaintiff's resources to fund the bond. As to the Phase I completion guarantee/bond, according to the Settlement Statement, Plaintiff paid $50,000.00 for a completion guarantee that was charged at $24,450.00, which leads to the question of what Bank Defendants did with the extra funds. Again, in yet another screwup, Bank Defendants, and apparently still retains, the funds paid by Plaintiff for the Phase II completion guarantee/bond. Bank Defendants concealed that they retained such funds.

67.    When Plaintiff needed the completion guarantee/bond and for McCune Defendants to perform, McCune Defendants sat on their hands and did virtually nothing to further the construction project. certainly have not picked up a hammer, have not performed any work, and have not organized work from any general contractor or subcontractor. They have not presented

a construction plan and have not performed a single act of construction. Every time Plaintiff has communicated with McCune Defendants, McCune has stated that he is searching for a new general contractor and/or project manager to complete the construction project. Such an assertion is odd being that Plaintiff paid McCune Defendants handsomely to step into the role of the general contractor.

68.     To make matters worse, Plaintiff learned from McCune that McCune Defendants are wholly unequipped to serve as the general contractor and to complete the construction. McCune informed Plaintiff that McCune Defendants have entered into hundreds of agreements requiring a completion guarantee/bond that were brokered by Bank Defendants, but have not had to actually perform on any one of these hundreds of completion guarantees/bonds. Instead, pursuant to Bank Defendants' interference and plan, McCune confirmed he "d[id] not know where to start" and "does not have crews to complete this job." McCune Defendants developed a "brother-in-law agreement" with Bank Defendants where Bank Defendants forced unsuspecting developers, including Plaintiff, to pay sizeable sums of money to McCune Defendants while ensuring McCune Defendants' inability to actually perform. Bank Defendants fully intended that McCune Defendants would have no ability to perform, would never perform, and would have no plans to perform. This was just another "shakedown" by Bank Defendants to line their own pockets, while simultaneously benefitting their buddy, McCune and his entity, McCune Construction.

69.     Defendants devised a scheme and plotted to unlawfully take Plaintiff's valuable and unique real property with substantial equity. Defendants committed unlawful acts to further their course of action to defraud Plaintiff.

## COUNT III: CONSPIRACY

70.    Plaintiff incorporates paragraphs 21-69 herein by reference as if such paragraphs were reproduced verbatim.

71.    An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  A civil conspiracy requires (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.  Once a civil conspiracy is proven, each co-conspirator is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.

72.    Defendants clearly developed a scheme to defraud and damage Plaintiff and had a meeting of the minds to do so.  Bank Defendants concocted and executed a scheme where it interfered with and interjected themselves into the construction project and moved beyond the funding of the loans.  The scheme had a common purpose and goal to be accomplished – to take over the construction project and, ultimately, seek to steal valuable real property and improvements from Plaintiff, specifically, the Property.  Plaintiff worked diligently to develop and construct an Apartment Complex on the Property.  But Bank Defendants had other plans.  Plaintiff was required to split the construction of the Apartment Complex into two phases, Phase I and Phase II.  Bank Defendants used fraud and deceptive to override Plaintiff's objections.  As Defendants anticipated, this construction plan mandated by Bank Defendants violated local code and resulted in a "Stop Work Order" issued by the City of Beaumont.  To fix the problem, Plaintiff simply asked that funds from the Phase II loan be moved to the Phase I loan to allow for the installation and construction of certain water pipes and a circle drive as required by the City of Beaumont.  Rather than acknowledge their ill desires and ineptitude, Bank Defendants doubled down.  After agreeing

to a loan modification to move such funds as needed, Plaintiff came to learn that Bank Defendants mandated that Plaintiff enter into a third loan for funds that were already earmarked under the Phase II loan, which further indebted Plaintiff.

73.    When Plaintiff objected to a third loan, Peterson told Plaintiff that it would have to enter into a third loan, or Bank Defendants would take action against Plaintiff to strip Plaintiff of the Property.  A third loan was never mentioned to Plaintiff and was only discovered when Plaintiff traveled to the title company to execute what was understood to be a simple loan modification to move certain necessary funds from the Phase II loan to the Phase I loan.  Peterson further informed Plaintiff that the Board mandated this course of action and would be aggressive in seeking to foreclose on the Property if Plaintiff did not do exactly as mandated by the Board.  Plaintiff was left with no choice but to execute documents for a third loan.

74.    To make matters worse, Bank Defendants conspired with McCune Defendants to further defraud Plaintiff.  Bank Defendants again overstepped their bounds and mandated that Plaintiff hire McCune Defendants to serve as the third-party inspector for the construction project and to issue a completion guarantee/bond.  As Bank Defendants planned, McCune Defendants appeared to fell asleep at the wheel and allowed OneForce to trample all over the construction project and receive payment for work not performed.  Ultimately, McCune Defendants and Bank Defendants distributed approximately 98% of the loan funds from the Phase I loan despite Phase I of the construction project being only 58.7% complete and Phase II is only approximately 8% complete.  When Plaintiff complained that McCune Defendants were not performing and were acting recklessly with construction funds, Bank Defendants shooed Plaintiff away and refused to remove McCune Defendants.

75.     As Bank Defendants have apparently done hundreds of times to unsuspecting developers and property owners, Bank Defendants conspired with McCune Defendants to require Plaintiff to enter into a completion guarantee/bond.  Plaintiff was told by Peterson that the completion guarantee is a completion bond that required substantial payment and a commitment of Plaintiff's resources to fund the bond.  As to the Phase I completion guarantee/bond, according to the Settlement Statement, Plaintiff paid $50,000.00 for a completion guarantee that was charged at $24,450.00, which leads to the question of what Bank Defendants did with the extra funds. Again, in yet another screwup, Bank Defendants retained, and apparently still retains, the funds paid by Plaintiff for the Phase II completion guarantee/bond.

76.     When Plaintiff needed the completion guarantee/bond and for McCune Defendants to perform, McCune Defendants sat on their hands and did virtually nothing to further the construction project.  McCune Defendants certainly have not picked up a hammer, have not performed any work, and have not organized work from any contractor or subcontractor.  They have not presented a construction plan and have not performed a single act of construction.  Every time Plaintiff has communicated with McCune Defendants, McCune has stated that he is searching for a new general contractor and/or project manager to complete the construction project.  Such an assertion is odd being that Plaintiff paid McCune Defendants handsomely to step into the role of the general contractor.

77.     To make matters worse, Plaintiff learned from McCune that McCune Defendants are wholly unequipped to serve as the general contractor and to complete the construction. McCune informed Plaintiff that McCune Defendants have entered into hundreds of agreements requiring a completion guarantee/bond that were brokered by Bank Defendants, but have not had to actually perform on any one of these hundreds of completion guarantees/bonds.  Instead,

pursuant to Bank Defendants' interference and plan, McCune confirmed he "d[id] not know where to start" and "does not have crews to complete this job."  McCune Defendants developed a "brother-in-law agreement" with Bank Defendants where Bank Defendants forced unsuspecting developers, including Plaintiff, to pay sizeable sums of money to McCune Defendants while ensuring McCune Defendants' inability to actually perform.  Bank Defendants fully intended that McCune Defendants would have no ability to perform, would never perform, and would have no plans to perform.  This was just another "shakedown" by Bank Defendants to line their own pockets and simultaneously benefit their buddy, McCune and his entity, McCune Construction.

78.    Defendants devised a scheme and plotted to unlawfully take Plaintiff's valuable and unique real property with substantial equity.  Defendants are two or more individuals and entities that conspired to defraud Plaintiff.  The members of the conspiracy, *i.e.,* Defendants, had a meeting of the minds to defraud Plaintiff.  Defendants committed unlawful acts to further their course of action to defraud Plaintiff.

## COUNT IV: MONEY HAD AND RECEIVED

79.    Plaintiff incorporates paragraphs 1-78 herein by reference as if such paragraphs were reproduced verbatim.

80.    Both Bank Defendants and McCune Defendants hold money that belongs to Plaintiff in equity and good conscience.

81.    Plaintiff paid Bank Defendants $50,000 allegedly for a "Completion Guaranty Fee" that was to be paid to McCune Defendants.  However, McCune Defendants only required payment of $24,450 for the "Completion Guaranty Fee."  Thus, Bank Defendants retained a difference of $25,550 ($50,000 - $24,450) that did not belong to them and was not owed for any work done on their part.

82.    Plaintiff paid Bank Defendants $20,640 allegedly or a "Guarantee Fee fbo McCune Construction Service Group, LLC."  This was to be paid by Bank Defendants to McCune Defendants.  Bank Defendants, however, never paid this money to McCune Defendants and wrongfully retained it for themselves.  Bank Defendants did nothing to earn this money, it did not belong to them, and was not owed to Bank Defendants.

83.    Plaintiff paid McCune Defendants as part of the Completion Guarantee/Bond by which McCune Defendants promised to complete the project should the general contractor fail to complete it.  Plaintiff also paid McCune Defendants for inspections that were not performed in accordance with industry standards and were cursory at best.  The general contractor failed to complete the project.  However, McCune Defendants then refused to step in and complete the project as they had promised to.

84.    Accordingly, both Bank Defendants and McCune Defendants received funds far in excess of what it was owed as a result of fraud, theft, and/or mistake of fact.  Bank Defendants and McCune Defendants have wrongfully retained funds received in excess of any valid legal claim to such funds.  As a consequence of Bank Defendants and McCune Defendants' actions and omissions, Plaintiff is entitled to compensation in an amount to be proven at the final hearing.

## COUNT V: WRONGFUL FORECLOSURE

85.    Plaintiff incorporates paragraph 1-84 herein by reference as if such paragraphs were reproduced verbatim.

86.    There is a defect in the foreclosure proceedings as Bank Defendants are not entitled to foreclose in accordance with the Loan Agreement.

87.    Because of Bank Defendants' actions, the foreclosure resulted in a grossly inadequate selling price.

88.    Bank Defendants failed to timely fund construction on multiple occasions, causing the deterioration of the relationship between Plaintiff and its former general contractor; lost draw requests; accelerated the note and moved to foreclose on the Property despite Plaintiff being current on all payments due and despite Bank Defendants knowing and acknowledging that the lien placed by OneForce on the Property was fraudulent; refused to fund the construction project, sabotaging Plaintiff's ability to continue full construction on the Property; and surreptitiously attempted to foreclose on the property.

89.    These actions caused the circumstances and defect that resulted in a grossly inadequate selling price of approximately $5 million.  Even in the incomplete stage it was sold, the Property was worth twice that much—approximately $10.3 million.  And if Bank Defendants had not purposefully interfered to bring about the foreclosure, the property would have been completed and worth approximately $18 million.

**COUNT VI: VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)**

90.    Plaintiff incorporates paragraphs 21-72 herein by reference as if such paragraphs were reproduced verbatim.

91.    Plaintiff asserts a violation of RICO based on 18 U.S.C. § 1962(c) in that "a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity."  Three (3) elements are common to all RICO claims under Section 1962 and are as follows: (1) a person who engages in, (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.

92.    Section 1961(3) defines the RICO person as including "any individual or entity capable of holding a legal or beneficial interest in property."  A RICO person must be one that either poses or has posed a continuous threat of engaging in acts of racketeering.  The RICO person

includes the individual members of the Board and McCune. Each of the aforementioned individuals is "capable of holding a legal or beneficial interest in property" and is, therefore, a "person" within the meaning of 18 U.S.C. § 1961(3).

93.     Bank and McCune Construction are entities who have come together and partnered with one another at the direction of McCune and the individual members of the Board. As a function of their fraudulent scheme, Defendants have worked together to defraud hundreds of unsuspecting developers and real property owners requiring the purchase of McCune Construction's completion guarantee/bond by informing unsuspecting developers and real property owners that such guarantee was actually a completion bond. Unbeknownst to Plaintiff, and hundreds of other similarly situated developers and real property owners, McCune Defendants had no ability to complete construction projects. In fact, McCune confirmed that McCune Defendants have never completed a construction project after a completion guarantee/bond was triggered. All the while, Plaintiff, and hundreds of other similarly situated developers and real property owners, were forced to pay substantial sums to line the pockets of Bank Defendants and McCune Defendants. The Defendants' association constitutes is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

94.     A RICO enterprise can be either a legal entity or an association-in-fact. Defendants developed an association that is an enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with the enterprise. Defendant shared the common purpose of (among other things) defrauding Plaintiff of money or property. The entities and individuals commonly associated in the enterprise possessed sufficient longevity for their members to carry out their purposes in that the enterprise has existed for at least five (5) years based on representations made by McCune, Peterson, Owens, and others.

95.     Both the activities of the enterprise and the predicate acts of racketeering described herein affect interstate commerce, as the Defendants have used instrumentalities of interstate commerce as detailed herein, including wires such as email communications, telephone communications, text messages, and wire transfers.   Section 1343 of the United States Code defines wire fraud as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing a scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

Plaintiff need only show that Defendants (1) developed a scheme to defraud, (2) money or property was the object of the scheme, and (3) used the wire to further the scheme.   Defendants collectively developed a scheme to defraud Plaintiff with fraudulent intent and carried out such scheme by communicating with Plaintiff by telephone calls, text messages, emails, and wire transfers, including payment for the completion guarantees/bonds by wires.

96.     Defendants clearly developed a scheme to defraud and damage Plaintiff and had a meeting of the minds to do so.   Bank Defendants concocted and executed a scheme where it interfered with and interjected themselves into the construction project and moved beyond the funding of the loans.   The scheme had a common purpose and goal to be accomplished—to take over the construction project and, ultimately, seek to steal valuable real property and improvements from Plaintiff, specifically, the Property.   Plaintiff worked diligently to develop and construct an Apartment Complex on the Property.   Bank Defendants however, had other plans.   Plaintiff was required to split the construction of the Apartment Complex into two phases, Phase I and Phase II. Bank Defendants used fraud and deceit to override Plaintiff's objections to this plan.   As Defendants anticipated, such a construction plan mandated by Bank Defendants violated local code

and resulted in a "Stop Work Order" issued by the City of Beaumont.  To fix the problem, Plaintiff simply asked that funds from the Phase II loan be moved to the Phase I loan to allow for the installation and construction of certain water pipes and a circle drive as required by the City of Beaumont.  Rather than acknowledge their ill desires and ineptitude, Bank Defendants doubled down.  After agreeing to a loan modification to move such funds as needed, Plaintiff came to learn that Bank Defendants mandated that Plaintiff enter into a third loan for funds that were already earmarked under the Phase II loan.  This further indebted Plaintiff.

97.    When Plaintiff objected to a third loan, Peterson told Plaintiff that it would have to enter into a third loan or Bank Defendants would take action against Plaintiff to strip Plaintiff of the Property.  A third loan was never mentioned to Plaintiff and was only discovered when Plaintiff traveled to the title company to execute what was understood to be a simple loan modification to move certain necessary funds from the Phase II loan to the Phase I loan.  Peterson further informed Plaintiff that the Board mandated this course of action and would be aggressive in seeking to foreclose on the Property if Plaintiff did not do exactly as mandated by the Board.  Plaintiff was left with no choice but to execute documents for a third loan.

98.    To make matters worse, Bank Defendants conspired with McCune Defendants to further defraud Plaintiff.  Bank Defendants again overstepped their bounds and mandated that Plaintiff hire McCune Defendants to serve as the third-party inspector for the construction project and to issue a completion guarantee/bond.  As Bank Defendants arranged, McCune Defendants appeared to fell asleep at the wheel and allowed OneForce to trample all over the construction project and receive payment for work not performed.  Ultimately, McCune Defendants and Bank Defendants distributed approximately 98% of the loan funds from the Phase I loan despite Phase I of the construction project being only 58.7% complete and Phase II of the construction project

being only 8% complete.  When Plaintiff complained that McCune Defendants were not performing and were acting recklessly with construction funds, Bank Defendants shooed Plaintiff away and refused to remove McCune Defendants.

99.     As Bank Defendants have apparently done hundreds of times to unsuspecting developers and property owners, Bank Defendants conspired with McCune Defendants to require Plaintiff to enter into a completion guarantee/bond.  Plaintiff was told by Peterson that the completion guarantee is a completion bond that required substantial payment and a commitment of Plaintiff's resources to fund the bond.  As to the Phase I completion guarantee/bond, according to the Settlement Statement, Plaintiff paid $50,000.00 for a completion guarantee that was charged at $24,450.00, which leads to the question of what Bank Defendants did with the extra funds.  Again, in yet another screwup, Bank Defendants retained, and apparently still retain, the funds paid by Plaintiff for the Phase II completion guarantee/bond.

100.     When Plaintiff needed the completion guarantee/bond and for McCune Defendants to perform, McCune Defendants sat on their hands and did virtually nothing to further the construction project.  McCune Defendants certainly have not picked up a hammer, have not performed any work, and have not organized work from any contractor or subcontractor.  They have not presented a construction plan and have not performed a single act of construction.  Every time Plaintiff has communicated with McCune Defendants, McCune has stated that he is searching for a new general contractor and/or project manager to complete the construction project.  Such an assertion is odd being that Plaintiff paid McCune Defendants handsomely to step into the role of the general contractor.

101.     To make matters worse, Plaintiff learned from McCune that McCune Defendants are wholly unequipped to serve as the general contractor and to complete the construction.

McCune informed Plaintiff that McCune Defendants have entered into hundreds of agreements requiring a completion guarantee/bond that were brokered by Bank Defendants, but have not had to actually perform on any one of these hundreds of completion guarantees/bonds. Instead, pursuant to Bank Defendants' interference and plan, McCune confirmed he "d[id] not know where to start" and "does not have crews to complete this job." McCune developed a "brother-in-law agreement" with Bank Defendants where Bank Defendants forced unsuspecting developers, including Plaintiff, to pay sizeable sums of money to McCune Defendants while ensuring McCune Defendants' inability to actually perform. Bank Defendants fully intended that McCune Defendants would have no ability to perform, would never perform, and would have no plans to perform. This was just another "shakedown" by the Bank Defendants to line their own pockets and simultaneously benefit their buddy, McCune, and his entity, McCune Construction.

102.    Defendants knowingly agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), & 1962(c), and for the unlawful purpose of intentionally defrauding Plaintiff. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of wire fraud as set forth above. All Defendants, as co-conspirators, are all liable for the predicate racketeering acts committed by a single co-conspirator.

103.    The racketeering activity at issue consists of two or more predicate criminal acts that are related and amount to or pose a threat of continued criminal activity. Based on representations of McCune and Bank representatives, Defendants have followed this pattern on hundreds of occasions. All of the acts of racketeering described above and herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. §§ 1961(5) & 1962(c), in that their common purpose was to defraud Plaintiff (and others) of money and property;

their common result was to defraud Plaintiff of money and property; Defendants, through their employees, members, or agents, directly or indirectly, participated in the racketeering acts and employed the same or similar methods of commission; Plaintiff was the victim of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events. Defendants' acts are related and amount to or pose a threat of continued criminal activity. In addition to violating the law as it pertains to Plaintiff, Defendants have used this scheme for the same or similar purposes, results, participants, victims, or methods of commission. Defendants have carried out this scheme "hundreds of times" and others will be discovered once discovery is conducted on these issues. Defendants consist of a group of entities and individuals that pose a great risk to the public and unsuspecting buyers. Their acts certainly pose a threat a continued criminal activity.

104.    All of the acts of racketeering described above were continuous so as to form a pattern of racketeering activity in that the acts provide a specific threat of repetition extending indefinitely into the future and/or that the acts are a regular way of conducting Defendants' ongoing legitimate business. Defendants operate as part of a long-term association that exists for criminal purposes, among others, and the predicate acts described above are the regular way of conducting ongoing legitimate business or of conducting or participating in an ongoing and legitimate RICO enterprise. Defendants have replicated this pattern of racketeering activity on more than one hundred occasions, which has shown to be the regular way. Defendants conduct their business affairs. At a minimum, Defendants' past conduct, by its very nature, presents the threat of repetition extending indefinitely into the future.

105.    As a direct and proximate result of, and by reason of, the racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property, within

the meaning of 18 U.S.C. § 1964(c). Plaintiff has suffered an economic injury which is concrete and particular. Specifically, Plaintiff has paid for the completion bond/guarantee and received nothing. In return, Bank Defendants have threatened and are continuing to pursue foreclosure on the Property despite Plaintiff paying loan fees and payments for many, many months while Bank Defendants refused to fund construction and McCune Defendants refused to honor the completion bond/guarantee. Plaintiff has substantial losses in rental income and increasing costs to complete construction. Plaintiff is, therefore, entitled to recover threefold the damages it sustained together with the costs of this suit, reasonable attorneys' fees, reasonable experts' fees, and any other and further relief as this Court may deem just and proper.

## COUNT VII: VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)

106. Plaintiff incorporates paragraphs 21-105 herein by reference as if such paragraphs were reproduced verbatim.

107. As alleged in great detail in Count VI, one or more of the following individuals violated 18 U.S.C. § 1962(c): Bank, the individual members of the Board, McCune Construction, and McCune. Any person(s) who is found to have violated 18 U.S.C. § 1962(c) is hereafter referred to as the "Operator / Manager" for the remainder of this Count.

108. Defendants conspired with the Operator / Manager(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Defendants intended to and agreed to further an endeavor of the Operator / Manager(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

109.   As set forth in great detail in Count VI, Defendants entered into an agreement to, among other things, require Plaintiff to purchase the completion guarantee/bond from McCune Defendants with full understanding and intent that McCune Defendants could not and would not perform.   Defendants have organized this scheme and conspired on hundreds of occasions. Defendants entered into such an agreement to line their pockets with the intent to defraud Plaintiff.

110.   Plaintiff was injured by Defendants' overt acts, which are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) acts of wire fraud committed through the enterprise as alleged above and in Count VI.

111.   As a direct and proximate result of, and by reason of, the activities of Defendants and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiff was injured in its business or property, within the meaning of 18 U.S.C. § 1964(c).   Plaintiff has an economic injury which is concrete and particular.   Plaintiff has paid for the completion bond/guarantee and received nothing. In return, Bank Defendants have threatened and are continuing to pursue foreclosure on the Property despite Plaintiff paying loan fees and payments for many, many months while Bank Defendants refused to fund construction and McCune Defendants refused to honor the completion bond/guarantee.   Plaintiff has substantial losses in rental income and increasing costs to complete construction.   Plaintiff is, therefore, entitled to recover threefold the damages they sustained together with the costs of this suit, reasonable attorneys' fees, reasonable experts' fees, and any other and further relief as this Court may deem just and proper.

## COUNT VIII: GROSS NEGLIGENCE

112.   Plaintiff incorporates paragraphs 21-111 herein by reference as if such paragraphs were reproduced verbatim.

113.    McCune Defendants and Bank Defendants owed a legal duty to Plaintiff and violated such duty causing harm to Plaintiff.  McCune Defendants and Bank Defendants knew their acts or omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff.  Despite having actual subjective awareness of the risks involved, Defendants proceeded in conscious indifference to the rights, safety, or welfare of Plaintiff.

114.    McCune Defendants wholly failed to do their job, costing Plaintiff millions of dollars.  As time progressed and the construction of the Apartment Complex lingered, Plaintiff learned that OneForce fell behind in paying subcontractors and was requesting payment for work that was not performed.  Plaintiff complained to Bank Defendants that McCune Defendants were not performing their duties and not monitoring the distribution of funds as required, but Bank Defendants refused to remove McCune Defendants and refused to allow Plaintiff to hire an inspector who would actually perform the duties and functions of its role.  McCune Defendants and Bank Defendants recklessly released funds to OneForce without confirming that the construction project was progressing as intended.

115.    On or about May 12, 2022, OneForce submitted a draw request for $234,900.00, indicating that the construction was 97.28% complete.  Quite to the contrary, McCune Defendants reviewed the Property and determined OneForce had completed "approximately 88%" of the construction project and was not entitled to an additional payment.  McCune Defendants recklessly failed at every level to perform their duties and distributed approximately 98% of the funds for Phase I of the construction project.

116.    A third-party inspector hired by Bank Defendants confirmed in October 2022 that Phase I of the construction project was only "about 60% complete."  After Plaintiff's expert's

review, it was confirmed Phase I is only approximately 58.7% complete and Phase II is only approximately 8% complete. Despite the construction project being woefully behind and the loan funds being recklessly distributed over the objection of Plaintiff, Bank Defendants and McCune Defendants failed to take any accountability for their failed oversight and the unbelievable failures in distributing funds to a general contractor who did not complete the work as required. Rather than look internally, Defendants pointed the finger at Plaintiff.

117.    After OneForce "walked the job" and was terminated, McCune Defendants candidly acknowledged that they had allowed this construction project to spiral out of control. In a declaration executed under oath, after OneForce "walked the job" and was terminated, McCune testified, in pertinent part, as follows:

> "Frankly, I am baffled by the filing of the [Lien Filings]. Based on my review of the [Lien Filings], they appear to be fraudulent and nothing short of fiction."

> ***

> "[OneForce] abused this project. [OneForce] failed to have adequate trades perform the required work. Many times, the project was empty and not being worked despite contractual deadlines. The filing of the [Lien Filings] is nothing short of absurd. McCune [Construction] was tasked with determining whether [OneForce] was entitled to payments. [OneForce] was not entitled to any other payments. [OneForce] has been paid for all work performed."

> ***

> "In McCune [Construction]'s reviews, it has uncovered numerous construction errors and defects."

> ***

> "Due to the state disarray of the project caused by [OneForce], there remains a significant amount of work that must be performed. The project is not complete."

118.    Admittedly, McCune Defendants were aware or became aware that OneForce was not completing the construction project as required and was making "numerous construction errors and defects."  This is shocking being that Plaintiff paid McCune Defendants for numerous project reviews prior to the release of funds.  Yet, McCune Defendants and Bank Defendants opened the checkbook and issued payment after payment for unperformed and faulty work.  These reckless errors caused the costs and the project in total to spiral out of control.  To date, Plaintiff is left with a partially built Apartment Complex with a substantial amount of work to be performed, errors to remedy, increased costs of construction, and depleted loan funds.

119.    Bank Defendants had an obligation to provide a loan for Plaintiff that would allow it to complete his construction project in a timely and cost-effective way, thus ensuring that it could recoup the money owed to the bank.  Instead, Bank Defendants structured the loans, and therefore the construction project, in two phases that severely inhibited Plaintiff's ability to find a competent general contractor who would build the complex in two phases resulting in the collapse of the construction project.

120.    By failing to issue a single loan, failing to fund the construction project,  and exercising excessive control over Plaintiff's business, Bank Defendants breached their duty to Plaintiff which led to the loss of millions of dollars to Plaintiff.  Bank representatives, including Peterson and Burak Berilgen, conducted more than ten personal inspections of the Property and construction project.  Bank Defendants control continued throughout the construction project and up to the date of foreclosure.

## COUNT IX: LENDER LIABILITY -- NEGLIGENCE

121.    Plaintiff incorporates paragraphs 21-120 herein by reference as if such paragraphs were reproduced verbatim.

122.    Bank Defendants owed a legal duty to Plaintiff and violated such duty causing harm to Plaintiff.  Bank Defendants' hands were all over the construction project at issue and caused Plaintiff to have to abide by Bank Defendants' whims and demands or face no funding and/or foreclosure.

123.    Bank Defendants had an obligation to provide a loan for Plaintiff that would allow it to complete the construction project in a timely and cost-effective way, thus ensuring that it could recoup the money owed to the Bank.  Instead, Bank Defendants structured the loans, and therefore the construction project, in two phases that severely inhibited Plaintiff's ability to find a competent general contractor who would build the complex in two phases resulting in the collapse of the construction project.

124.    By failing to issue a single loan, failing to fund the construction project, and exercising excessive control over Plaintiff's business, Bank Defendants breached their duty to Plaintiff which led to the loss of millions of dollars to Plaintiff.  Bank representatives, including Peterson and Berilgen, conducted more than ten personal inspections of the Property and construction project. Bank Defendants control continued throughout the construction project and up to the date of foreclosure.

## COUNT X: LENDER LIABILITY – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

125.    Plaintiff incorporates paragraphs 1-124 herein by reference as if such paragraphs were reproduced verbatim.

126.    A claim for breach of duty of good faith and fair dealing is a tort action that arises from an underlying contract that creates a "special relationship" between the parties. A special relationship arises from the element of trust necessary to accomplish the goals of the undertaking or when imposed by the courts due to an imbalance of bargaining power.

127.    Plaintiff is an immigrant and non-native English speaker who only been in the United States for a few years. Bank has been in business for many, many years in the United States.

128.    Bank Defendants' used their superior bargaining position, misrepresentations, and material omissions to induce Plaintiff to enter into a multiphase loan that put his construction project in jeopardy. Based on Bank Defendants' representations, Plaintiff believed he had no other option than to agree to the loans.

129.    Bank Defendants' superior bargaining power is most evident in their coercion of Plaintiff to agree to a third loan from Bank. Plaintiff sent a representative hundreds of miles (from the Dallas/Fort Worth Metroplex to Houston) to sign what he was told would be a loan modification that would allow him to continue the construction project. When the representative arrived, however, Bank Defendants presented him with a third loan, not a modification. Plaintiff was livid, but was told that if he refused to execute the third loan, construction would cease, there would be no additional funding, and Bank would foreclose on the property. Believing there was no other choice, Plaintiff executed the loan.

130.    The close business relationship between Bank Defendants and McCune Defendants put Bank in the position of being able to have excessive control over Plaintiff's business dealings. Each step of the loan and construction process was executed under the control and coercion of Bank Defendants.

131.    The contracts between Bank Defendants and Plaintiff created a special relationship between the parties due to Bank Defendants' excessive control over Plaintiff's business dealings. This excessive control created a fiduciary relationship between Bank Defendants and Plaintiff which in turn created an implied duty of good faith and fair dealing for Bank Defendants.

132.    By taking advantage of the Parties' special relationship and manipulating and controlling Plaintiff, Bank Defendants breached their duty of good faith and fair dealing, which ended up costing Plaintiff millions of dollars.

### COUNT XI: LENDER LIABILITY – BREACH OF FIDUCIARY DUTY

133.    Plaintiff incorporates paragraphs 21-132 herein by reference as if such paragraphs were reproduced verbatim.

134.    "Lender liability" occurs when a lender exercises too much control over a borrower. When a lender interjects into the lenders project and exercises excessive control over the borrower, the lender assumes the role of a fiduciary and is no longer merely a creditor.  As a result of Bank Defendant's excessive interference in the construction project and Plaintiff's business affairs, Plaintiff and Bank Defendants had a fiduciary relationship.  Bank Defendants breached their fiduciary duties, including duties of care, loyalty, good faith, and fair dealings, with Plaintiff resulting in financial injury.

135.    Being that Bank Defendants deceitfully required construction to be split into phases, Plaintiff was required to obtain two (2) loans for the construction of the Apartment Complex, which resulted in the necessity to find a general contractor that would construct the Apartment Complex in an unorthodox fashion in two (2) phases and under the terms of two (2) contracts.  Bank Defendants required that Plaintiff and any general contractor enter into two (2) separate contracts delineated as Phase I and Phase II.

136.    For reasons unknown, Bank Defendants appeared to want to be the general contractor of the construction project on the Property and interjected itself time and time again. For example, on January 26, 2021, the City of Beaumont Fire Prevention Division issued a "Stop Work Order.  The basis for the "Stop Work Order" was as a result of construction that had to be performed to allow the fire department access to the Property.  Because Bank Defendants required that construction be split into phases, Phase I and Phase II, which placed Plaintiff in an unwinnable predicament.  The fire department must have a drive that allows for fire vehicles to enter and exit in a loop and also must have access to water.  Under Bank Defendants' requirements, some of the funds to complete these obligations were in the Phase I loan, and some were in the Phase II loan. Bank Defendants demanded that construction of Phase I be completed before any construction in Phase II would occur.

137.  In response to this predicament, Plaintiff's representative asked for funds necessary to complete the construction requirements mandated by the fire code and to continue construction. A simple transfer of funds from the Phase II loan to the Phase I loan would have easily remedied the issue.  Bank Defendants were receptive and agreed to do so.  However, when Plaintiff's representative arrived to close the loan modification, he learned that Bank Defendants had misrepresented the terms to him.  In fact, Bank Defendants prepared a third loan, not a modification.  When Plaintiff's representative learned of the misrepresentation, he immediately called Peterson and demanded to know why Bank Defendants made such material misrepresentations.  In the "gotcha" moment, Peterson said the Board is well aware of the circumstances and required a third loan.  Plaintiff was livid, but was told if he refused to execute the third loan that construction would cease and there would be no additional funding.  Such direction, according to Peterson, was given directly by the Board.  This was a shocking approach

to place Plaintiff in despair, especially when the exact funds needed were already budgeted as a part of the Phase II loan.

138.    Bank Defendants informed Plaintiff that Plaintiff was required to hire McCune Defendants to serve as a third-party inspector and to provide a completion guarantee/bond. Bank Defendants represented to Plaintiff that McCune was a long-time business associate of Bank and provided a bond that could be triggered in the event the general contractor failed to complete construction. The bond, as represented by Bank Defendants, would be paid by Plaintiff to McCune Construction at closing for both the Phase I and Phase II loans. Bank Defendants' representatives represented that McCune Defendants had been hired by Bank Defendants hundreds of times to perform services and required developers, like Plaintiff, to hire McCune Defendants.

139.    After demanding that Plaintiff hire McCune Defendants, Bank Defendants moved forward and brokered an agreement requiring Plaintiff to use McCune Defendants as a third-party inspector to oversee and distribute the funds to OneForce. Plaintiff, as well as OneForce and Bank Defendants, entered into written agreements with McCune Defendants to perform such services for Phase I on or about December 30, 2019, and for Phase II on or about November 1, 2021. McCune Defendants' written agreements state that "[Bank] appoints McCune [Defendants] as its agent for the sole purpose of providing Progress Reviews and Funds Disbursement services on the [Apartment Complex], including but not limited to periodic Progress Reviews and Reports." As a part of the function of McCune Defendants' role, McCune Defendants were required to follow the construction project to determine whether work was performed to distribute funds to the general contractor, OneForce. It was represented by Bank Defendants and McCune Defendants that McCune Defendants would closely follow the construction schedule to make sure the general contractor completed all necessary tasks before being paid and, further, would make sure that the

construction project stayed oncourse in terms of construction and distribution of funds based on work actually completed. Plaintiff paid McCune Defendants to conduct site inspections and distribute funds for work performed. Ultimately, Plaintiff paid McCune Defendants for the review of twenty-two (22) draw requests despite relevant agreements calling for only eight (8) draw requests.

140.    As noted above, in addition to McCune Defendants' role as the third-party inspector and overseeing and causing the distribution of funds, Bank Defendants demanded and, ultimately, brokered an agreement requiring Plaintiff to purchase what was represented as a bond and labeled as "The Completion Guarantee." Such completion obligation and bond would only be triggered when the general contractor failed to perform. Specifically, McCune Construction indicated it ***"is so confident in its ability to manage the construction loan funds of your project that it guarantees its performance to the extent that should Contractor fail to perform the Work it will assume complete responsibility for the management of all construction activities on the Project needed to complete the project…."*** Plaintiff made payment for the bond and guarantee at closing on both the Phase I loan and Phase II loan.

141.    Plaintiff met its obligations, as required by Bank Defendants, to pay for the bond. Interestingly and without explanation, the Settlement Statement for the Phase I loan shows that Plaintiff paid $50,000.00 for the "Completion Guaranty Fee to Wallis Bank" despite the McCune Defendants' agreement stating the same, requiring payment of only $24,450.00. Likewise, the Settlement Statement for the Phase II loan shows that Plaintiff paid $20,640.00 for the "Guarantee fee fbo McCune Construction Services Group, LLC to Wallis Bank," but Bank Defendants apparently never transferred such fee to McCune Defendants. McCune Defendants refused to

accept their duties and obligations for the guarantee/bond fee and demanded additional funds from Plaintiff. Bank Defendants remain in possession of these funds to this day.

142.    Due to Bank Defendants' interference, meddling in the construction, and selection of vendors, the construction of the Apartment Complex was doomed to fail. Bank Defendants "screwed up", "dropped the ball", and confirmed Plaintiff had a "legitimate grievance" due to Bank Defendants' errors. For reasons unknown, Bank Defendants has made the construction project on the Property unnecessarily difficult, interfered with construction, and has caused and been a part of numerous errors.

143.    Bank Defendants exerted extreme control over Plaintiff in the transaction and subsequent construction project. By its deceit and material omissions, Bank Defendants orchestrated the circumstances surrounding the loans so that Plaintiff would be at their mercy, with Plaintiff's only recourse if things went wrong being its completion bond with McCune Defendants, who Bank Defendants had ensured would not perform according to the terms of the bond. Bank Defendants arranged for Plaintiff to owe them a significant amount of money with Plaintiff's most valuable asset, the property, being held as collateral. Based on the circumstances of the loans that Bank Defendants arranged, there was always a possibility of a foreclosure because the funds were being distributed to OneForce despite work not being completed and the two-phase design of the project violated local construction codes and regulations. This was exactly what Bank Defendants had intended. It set Bank Defendants up to be able to threaten foreclosure if Plaintiff did not do exactly what Bank Defendants demanded. This allowed Bank Defendants to exert extreme control over Plaintiff.

144.    Once Bank Defendants had secured this extreme control due to its deceit and material omissions, Bank Defendants then used it to take Plaintiff's property from him, stealing a

significant amount of equity that Plaintiff had in the project. Bank Defendants tortiously interfered with Plaintiff's contract with McCune Defendants so that McCune Defendants would spend all the money in Phase I of the loan, despite Phase I of the construction project only being 58.7% complete and Phase II of the construction project only being 8% complete, leaving no funds to finish the remaining 41.3% and 92%, respectively.

145.    Bank Defendants next used the impossible situation Plaintiff was in to force him to take on a third loan, instead of a modification of the two loans. There was already money in the second loan to comply with the applicable building codes and regulations. But rather than allowing Plaintiff to apply Phase II money to necessary items—such as water and a circular drive—that had been arbitrarily marked as part of Phase II, Bank Defendants forced Plaintiff to take out a third loan. But Bank Defendants did not even tell Plaintiff that it was a third loan until Plaintiff reached the bargaining table. Instead, Bank Defendants tricked Plaintiff, telling him it was going to be a loan modification, and waited until Plaintiff had no meaningful alternative before forcing the third loan upon him. Bank Defendants included in the third loan a "release of liability provisions," which—though unenforceable—constituted an attempt by Bank Defendants to get away with their fraudulently, bad faith conduct and steal Plaintiff's property and acquire significant equitable value in it, without Plaintiff being able to hold them responsible for any of their wrongful and illegal actions. If Plaintiff did not agree to this third loan, Bank Defendants threatened, and would have, immediately foreclosed on Plaintiff's property. The only reason Bank Defendants were even in a position to foreclose on Plaintiff's property was because of their deceit and wrongful conduct.

146.    Bank Defendants also fully intended and ensured that receiving the third loan would not solve any of Plaintiff's problems. Once OneForce left, Bank Defendants refused to permit Plaintiff to hire any general contractor other than McCune Defendants to complete the construction

project. Indeed, the way Bank Defendants' arranged the loan agreement dissuaded most general contractors from taking the project anyways. As a result, Plaintiff was unable to complete the project, even with the third loan, exactly as Bank Defendants planned. This allowed Bank Defendants to foreclose on the property and buy it at a significant discount from its true economic value, depriving Plaintiff of his valuable equity in the property.

147.    These actions breached Bank Defendants' fiduciary duties, including duties of care, loyalty, good faith, and fair dealings, with Plaintiff resulting in financial injury.

### COUNT XII: VIOLATIONS OF THE TEXAS INSURANCE CODE

148.    Plaintiff incorporates paragraphs 21-147 herein by reference as if such paragraphs were reproduced verbatim.

149.    The actions of Bank Defendants and McCune Defendants constitute the "business of insurance" as defined by the Texas Insurance Code, including Section 101.051(b)(4)(B). Without an appropriate license, Bank Defendants brokered a deal whereby it demanded that Plaintiff purchase a "completion guarantee," referred to as the completion bond, from McCune Defendants. The actions of Bank Defendants and McCune Defendants constitute unfair and/or deceptive acts or practices in violation of Sections 541.051(4), 541.052, 541.055(2), and 541.061 of the Texas Insurance Code. Such provisions of the Texas Insurance Code constitute tie-in statutes under the DTPA. Such unfair and/or deceptive acts or practices were conducted and performed intentionally and knowingly.

150.    Bank Defendants demanded and, ultimately, brokered an agreement requiring Plaintiff to purchase what was represented as a bond and labeled as "The Completion Guarantee." Such completion obligation and bond would only be triggered when the general contractor failed to perform. Specifically, McCune Construction indicated it ***"is so confident in its ability to***

***manage the construction loan funds of your project that it guarantees its performance to the extent that should Contractor fail to perform the Work it will assume complete responsibility for management of all construction activities on the Project need to complete the project…."*** For this bond and guarantee, Plaintiff was required to pay and did pay for the bonds.

151.    Plaintiff met its obligations, as required by Bank Defendants, to pay for the bond. Interestingly and without explanation, the Settlement Statement for the Phase I loan shows that Plaintiff paid $50,000.00 for the "Completion Guaranty Fee to Wallis Bank" despite the McCune Defendants agreement stating the same, requiring payment of only $24,450.00. The additional fee was apparently kept by Bank Defendants as a broker's fee. Likewise, the Settlement Statement for the Phase II loan shows that Plaintiff paid $20,640.00 for the "Guarantee fee fbo McCune Construction Services Group, LLC to Wallis Bank," but Bank Defendants apparently never transferred such fee to McCune Defendants. McCune Defendants refused to accept its duties and obligations for the guarantee/bond fee and demanded additional funds from Plaintiff. Bank Defendants remains in possession of these funds to this day.

152.    After OneForce was unable to complete the job and was terminated, Bank Defendants pushed for McCune Defendants to serve as the general contractor. Bank Defendants informed Plaintiff that it had required hundreds of completion guarantees/bonds with developers and McCune Defendants. Bank Defendants, according to Peterson, said McCune Defendants were the right contractor to complete the job and demanded that Plaintiff utilize McCune Defendants to complete the project. At the request and mandate of Bank Defendants, on November 2, 2022, Plaintiff triggered the completion guarantee/bond that was described to Plaintiff by Bank Defendants as a bond of completion.

153.    Since triggering the completion guarantee/bond, McCune Defendants have done virtually nothing.  They have not presented a construction plan and have not performed a single act of construction.  Every time Plaintiff has communicated with McCune Defendants, McCune has stated that he is searching for a new general contractor and subcontractors to complete the construction project.  Such an assertion is odd being that Plaintiff paid McCune Defendants handsomely to step into the role of the general contractor.

154.    To make matters worse, Plaintiff learned from McCune that McCune Defendants are wholly unequipped to serve as the general contractor and complete the construction.  McCune informed Plaintiff that McCune Defendants have entered into hundreds of agreements requiring a completion guarantee/bond that were brokered by Bank Defendants, but have not had to actually perform on any one of these hundreds of contracts.  Instead, pursuant to Bank Defendants' interference and plan, McCune confirmed he "d[id] not know where to start" and "does not have crews to complete this job."  McCune Defendants developed a "brother-in-law agreement" with Bank Defendants where Bank Defendants forced unsuspecting developers, including Plaintiff, to pay sizeable sums of money to McCune Defendants while ensuring McCune Defendants' inability to actually perform.

**COUNT XIII: VIOLATIONS OF TEXAS'S DECEPTIVE TRADE PRACTICES ACT**

155.    Plaintiff incorporates paragraphs 21-154 herein by reference as if such paragraphs were reproduced verbatim.

156.    Defendants have violated Sections 17.46 and 17.50(a)(1) of the Texas Business and Commerce Code, by conspiring to have Plaintiff take out loans for the construction of the project with Plaintiff's property as collateral, and then orchestrating the circumstances surrounding the project so that it could not be completed according to the terms of the loan so that Defendants

could obtain the property for less than market value at Plaintiffs' expense; and Defendants used deceptive representations in order to induce Plaintiff to enter into the loan agreements.  Plaintiff qualifies as a consumer.  Defendants engaged in false, misleading, or deceptive actions.  Plaintiff did not discover, not should he have discovered Defendants false, misleading, and deceptive practices until November of 2021 as that was when Plaintiff learned that McCune Defendants had no ability to perform despite Bank Defendants' demands and requirement that Plaintiff use the service of McCune Defendants to complete the construction project. The acts were a producing cause of Plaintiff's damages.  As a consequence of Defendants' actions and omissions, Plaintiff is entitled to compensation in an amount to be proven at the final hearing.

## VI.     DAMAGES AND RELIEF

157.    All conditions precedent for recovery have been met.

158.    **Attorneys' Fees.**  Plaintiff incorporates paragraphs 21-157 herein by reference as if such paragraphs were reproduced verbatim.  Plaintiff has been required to retain the services of an attorney to enforce its rights and is entitled to recover reasonable and necessary attorney's fees and costs of court.  In accordance with Section 38.001 of the Texas Civil Practice & Remedies Code, Section 17.50 of the Texas Business and Commerce Code, Section 541.152 of the Texas Insurance Code, Section 1964(c) of the United States Code, and the principles of equity, Plaintiff is entitled to seek and obtain attorneys' fees from Defendants.  Pursuant to the usual and customary fees for a claim of this type, Plaintiff is entitled to reasonable and necessary attorneys' fees for the preparation and trial of this case and additional attorneys' fees in the event of an appeal or other proceedings before the United States Court of Appeals for the Fifth Circuit and the Supreme Court of the United States.

159.    **Exemplary Damages.**    Plaintiff incorporates paragraphs 21-157 herein by reference as if such paragraphs were reproduced verbatim.  Defendants' acts as set forth herein constitute fraud, malice, or gross negligence.  As a result of the acts or omissions set forth herein, Plaintiff is entitled to the recovery of exemplary damages.

160.    **Threefold Damages.**  Plaintiff incorporates paragraphs 21-157 herein by reference as if such paragraphs were reproduced verbatim.  As a result of Defendants' unlawful conduct, Plaintiff is entitled to recover "threefold the damages [Plaintiff] sustains" in accordance with Section 1964(c) of the United States Code.

161.    **Treble Damages.**  Plaintiff incorporates paragraphs 21-157 herein by reference as if such paragraphs were reproduced verbatim.  As a result of Defendants' unlawful conduct, Plaintiff is entitled to recover "three times" Plaintiff's economic damages in accordance with Section 17.50 of the Texas Business and Commerce Code.

## VII.    DEMAND FOR TRIAL BY JURY

162.    Plaintiff demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## VIII.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that it be awarded judgment against Defendants as follows:

1.    Plaintiff have judgment against Defendants and recover all damages including, but not limited to, actual damages, consequential damages, mental anguish, economic damages, non-economic damages, loss of credit, loss of equity, damage to credit, special damages, threefold damages, treble damages, statutory damages, and all other damages and recovery available at law or in equity;

2.    Plaintiff have judgment and recover on its causes of action as asserted herein;

3.    Court costs;

4.    Reasonable and necessary attorneys' fees;

5.    Expert costs and fees;

6.    Exemplary damages;

7.    Pre-judgment and post-judgment interest; and

8.    Any other legal or equitable relief, whether general or specific, to which Plaintiff may be entitled.

Respectfully submitted on the 19th day of October, 2023.

**DENNIE FIRM, PLLC**
99 Trophy Club Drive
Trophy Club, TX 76262
817.430.5876
817.430.5801 – Facsimile

By:*/s/ Christian Dennie*
    **Christian S. Dennie**
    State Bar No. 24045775
    cdennie@denniefirm.com
    **Sarah Pack**
    State Bar No. 24083611
    spack@denniefirm.com

*COUNSEL FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

I certify that on October 19, 2023, I electronically filed the foregoing *Second Amended Complaint* with the Clerk of the Court for the United States District Court, Northern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record by electronic means.

*/s/ Christian Dennie*
Christian Dennie